All right, next case we're going to hear is Richard Ruth's Bar v. Founders Insurance and Mr. Eberle. Good morning and may it please the Court. My name is Kevin Eberle and this morning I'll be speaking on behalf of Mr. Emanuel Cahagias. Mr. Cahagias was, back in September of 2012, a patron to a local bar and restaurant just outside of Charleston, South Carolina, known as Ruth's Bar & Grill, when he suffered debilitating injuries as a result of an attack by another patron at the same restaurant. Founders Insurance Company, on the other hand, who is the plaintiff in the declaratory judgment case, had the insurance on that bar and restaurant. They had $100,000 in liability coverage. Even though the injuries that Mr. Cahagias suffered left him in a vegetative state requiring 24-hour-a-day care, Founders Insurance coverage has been denied on the basis, they say, of a lack of notice of the lawsuit and the claims. When I was first involved in this case about a year and a half ago, I was told that it would raise several interesting issues of South Carolina substantive insurance law. And as things have come along, that's actually not the case. It turns out this entire case is sort of a pedestrian application of the familiar summary judgment standards. On January 8, 2013, Jane Ruth was served with a summons, is that correct? That's correct. Which she sent to her agent, Dumez. Yes. Ruth's agent forwarded the notice of representation, but not the summons and complaint to Hull, is that correct? In fact, it's included in a statement of undisputed facts. No, Your Honor, that's not correct. The letter of representation was received in November of 2012. According to the statement of undisputed facts in support of summary judgment, Founders posits that Ruth did not provide copies of the summons and complaint to Dumez, Hull, or Founders, and that's at Joint Appendix 203. Your Honor, the position is that notice was indeed provided to Founders and through their agent, Hull. The notice of representation was provided, but not the summons and complaint. Is that correct? The notice of representation was definitely provided to Sherry Dumez, who, as Your Honor notes, is the immediate insurance agent, and she admits that she passed that on to her superior. Yes, the notice of representation, but not the summons and the complaint. Your Honor, I don't think you're fairly stating the record. The question is focused on she did not, was not able to say in her deposition that she passed on the complaint and that she received the complaint. She said so later in an affidavit. That's correct. And that raises the question of whether you can create a factual question with your own testimony, and the answer is no, going from the Supreme Court to our court, for a lot of good reasons. But the fair statement of the record is that it seems to me that it's not established that the complaint was given to Dumez. Your Honor, you're referring there to the sham affidavit rule. The sham affidavit rule of this Court is the same. Well, we can argue that on the side, but is my statement of the record accurate? I'm sorry? Is my statement of the record accurate? In other words, you said as a matter of fact that Dumez was given the complaint. And Dumez did not say that in her deposition. Well, Dumez doesn't say that in her discovery, but Mrs. Ruth does say that in her affidavit. In her affidavit, which is contrary to what she said. Excuse me, not Dumez. What Ruth said in her deposition. Well, Your Honor. It's contrary to what she said at the default hearing as well, which was the basis of the State court default. So any question about that was only created later by Ruth's inconsistent testimony, which, as Judge Niemeyer points out, cannot create a dispute of material facts for summary judgment purposes. Your Honor. I know we're hitting you with a bunch, but you still, I don't think, have addressed, even aside from whether the notice of claim was given by Ruth to her agent, whether there's any evidence whatsoever in the record that the summons and complaint was provided to either founders or to Hull until after the default was entered. Your Honor, a few points if I may. Did you say yes or no? Is there any dispute of fact as to whether the summons and complaint was given by Ruth to Dumez or to founders until after the entry of default? Yes, Your Honor, there is. And where in the record is that? Her affidavit says that she presented the summons and the complaint to Ms. Dumez. Let's set aside the affidavit. We can discuss that rule later. But let's set it aside now as inconsistent, as not acceptable. Setting aside that affidavit, is there any evidence in response to Judge Duncan's question? Yes, Your Honor, there is. On January 8th, as has been noted, was the service of the summons and complaint. The following day, on January 9th, there was an exchange of e-mail correspondence between Ms. Dumez and Hull's representative, a woman by the name of Melanie Yount. You looked at those e-mails carefully, didn't you? I did. And they referred to another claim, didn't they? Mrs. Yount. An entirely different incident. No, Your Honor. What has happened in that conversation is that Mrs. Yount referred to an earlier case from 2011, which was a dog bite case. Ms. Dumez responds to that e-mail and says, Thank you, but actually the case that we're talking about is an assault and battery case from 2012, which is the biggie that we are all worried about. That description of the case from Maybe you can just tell me what e-mail that is. Sure. That would be helpful. Your Honor, that's on page 711 of the record. And she writes, Thanks for this, but there is yet another one for an assault and battery claim that happened in 2012. This is the biggie we are worried about. That description could not possibly have been a reference to the dog bite case from 2011, which was not an assault case or assault and battery case, and also would not have been the biggie that anybody would be worried about. That communication took place the day after the summons and complaint was indisputably served on Mrs. Ruth. There's no question about the timing of that. Yeah. Okay. Is it your argument that based on the date and the reference to the 2012 incident, that that means the summons and complaint had been provided? Yes. And maybe that's the argument that by implication, but there's no document that says the summons and complaint had been provided to Hull or Founders, correct? That's true, Your Honor. Okay. I understand. Sure. I'm sorry. I didn't mean to cut you off. No, that's fine. In May, just to continue the answer to that, in May of 2013, there's also a further investigation. In May of 2013, everybody agrees that Founders was totally aware of what's going on. And undertook to defend the Ruths subject to a reservation of rights after the entry of default. Yes, yes. In May of 2013, one of the adjusters for Founders contacts Ms. Dumas and asks for the originals, if she still has the originals. And she says, no, I returned the originals to Mrs. Ruth or to the Ruths. The reference to the originals can only possibly have been a reference to the summons and the complaint. The demand letter was a simple fact, so she would not have referred to the originals at all. She also testifies that there were no communications about the coverage issue between January 9th and May 13th, I believe it is. And so if she ever had received a copy of the summons and complaint, which she is referring to in May of 2013, she must have received the summons and complaint in January. Which, by the way, is consistent with what Mrs. Ruth has said. You're talking about Ms. Dumas now having received it then, correct? Yes. But even if that's the case, there's no evidence that was then provided or transmitted to Hull or Founders, is there? Well, there's testimony, number one, I suppose there's testimony, and this is on page 569 and 570 of the record, that Sherry Dumas had as her M.O. always forwarding on material to Hull and Company. And this, by the way, has occurred repeatedly. Any time that the Ruths faced any sort of legal issues, lawsuits, what have you, they would always contact Ms. Dumas, who would then pass on the information to Hull and it would make its way up to Founders. And so historically, this has always been the way that this is handled. So your evidence that Founders received the complaint is based on this 7-11 e-mail? Yes, Your Honor, and we don't have to show. How does anybody know what the big E refers to? I'm sorry? How does anybody know when the big E is referred to? They don't know there's a big E. They've never even got suit. Well, Your Honor, we have to assume here that... Why? Why do we have to assume? There's no question given that Mrs. Ruth, again, in her affidavit, says that she communicated the summons and the complaint to Mrs. Dumas. Mrs. Dumas here refers to that lawsuit in an e-mail with Hull and Company. That's adequate to put them on notice of the lawsuit. I'm trying to figure out how would this... Who's this e-mail going to, Melanie Yount? Yes. And who is she with? She's with Hull. Okay. And how do we know that Hull knew of a big E at that point? That's the subject of the e-mail is she's referring to the lawsuit. I know, but big E is like a pronoun. It alludes to something, right? That's right. Well, how do we know what it alludes to? Well, Your Honor, this... From Yount's point of view. Well, this gets back to the Hull, I'm sorry, not the Hull, to the Ruth affidavit saying that Mrs. Ruth passed on the summons and the complaint to Mrs. Dumas and... I've asked you to set aside the affidavit at this point. Yes, and Mrs. Dumas then has testified that she always then would pass on that sort of summons and complaint and paperwork on up the chain. Doesn't answer my question at all. I'm trying to find out how does Yount know what big E means. There's a note here written, and I don't know if this is Yount's writing, but it says, Debbie sent me information on wrong claim. Right. That's post. That's later. Right. That was because Ms. Yount initially had thought that the materials had to do with the dog bite case, which was, again, from 2011. That gets back to my question. I gather you don't have any written evidence or any other testimony except for that affidavit. Right. All right. Let's assume that we conclude there's no evidence that the complaint was provided to founders or to Hull before the entry of default. Do you maintain that the entry of default is no prejudice to founders? It's not prejudice to founders. In August and September of 2013, our client took the initiative and broached the topic of settling the case, even after the default had already been entered at that stage. I'm sorry. When was that? August. I believe it was August of 2013. After the default. Yes. After the default. Yes. When its hand was strengthened, wouldn't you say? That's a very good point, Your Honor, that ideally a person in the position of the plaintiff in the underlying lawsuit then would think, well, my hand is strengthened. They didn't take advantage of that. They didn't let them out of default. I mean, they insisted on holding them in default when there was a hearing coming up. You didn't think that didn't indicate that? No, but Cahagias opposed the entry of default, the attempt to set aside the entry of default. Yes, that's right. So clearly Cahagias thought it was to his advantage to have the entry of default. Your Honor, whether or not that is true. Well, it is. If Cahagias opposed it, clearly he would be presumed to act in his own best interest. True. To establish any amount of prejudice, however, Founders is going to have to show that they ended up in a different position than they would have been otherwise. You don't think default judgment is in a different position? No, I don't, Your Honor, because the representative, Carlos Ortiz, testifies that given the severity of the injuries in this case, that Founders would have gone ahead and paid the policy limits regardless. And so the entry of default did not prejudice Founders' position at all. Why would they pay if they had no knowledge, no liability? In other words, this is a bar fight. And it happened very quickly, apparently. And you don't think they had a good defense? Your Honor, I have no idea whether they would have a good defense. You said that they would have paid the policy limits. Yes. I wonder why they would have paid anything. Your Honor, I can only tell you that on page 632 of the record, Carlos Ortiz says that they would have paid the limits. That's the statement from Founders, that they would have paid the limits given the severity of the injuries in this case. And, again, the... I thought they proffered the limits in an attempt to settle. When everybody figured out what the limits were. Yes. After the settlement window had already closed. There was some confusion about what the limits were. You read them differently. Right. And, as I recall, when there was a response within you, there was a letter giving them some period of time. That's right. And because it was not met, the settlement offer, it was sent on August 27th, and the letter went on to say that payment had to be received by September 9th. Uh-huh. And Founders proffered $50,000. Apparently there was some confusion. That's right. And then on September 10th, the settlement offer was withdrawn. When Founders wrote to say that it had reexamined the policy and determined that the limits were 105, which proffered and proffered, there was no response. That's right. Your Honor is correct with the timeline that Mr. Kahages was the one who broached the topic of settling the case. But with the settlement, I'm not quite sure. Maybe I'm not sure what your point is with respect to that. So perhaps if you could just tell me the point you're making, it would be clearer to me. Sure. This responds to the idea that Judge Quattlebaum had about whether or not there was any prejudice in the case. And our position, and this is documented with the evidence. Well, the settlement would be in release of claims, correct? Yes. And you refused the $105,000 even when they offered or didn't respond to it. Right. After the window for settlement had closed, yes. You had identified, yes. Six weeks later. Self-imposed limit. Self-imposed limit. But my point is at that point, you had an offer for $105,000, which you stipulate now to be the policy limits. You're saying there's no prejudice to being entered in default, and you rejected by not responding to what you're seeking to recover here today. Our client had said that he would have accepted the policy limits had they been offered. They were not offered when the window was still open. At some point, my client is allowed to close the window on settlement talks and proceed with the case. Now he's trying to open them again. As I recall, there is testimony that he would not have accepted the settlement limits at that time. Let's see if I can find it in my notes. But in any event. His testimony, this is the guardian now. Of course, Mr. Kages is incapable. But his guardian testified during his deposition that he would not have accepted the limits, not the limits, that he would not have accepted the $50,000 or $100,000 when he believed that the policy limits were much higher. That's the only statement that is made at any point during his deposition. Did he think they were $1 million? Yes, Your Honor. And it's not unreasonable then, or $1 million and $5,000 for the med pay. The med pay. Right. But the $1 million for liability. There's no reason, of course, that anybody in that position with an invalid who has more than $5 million in injuries would have accepted less than the policy limits. Sure there is. I'm sorry. Go ahead. It will be clear to you. People accept less than the policy limits all the time if they have weak liability defenses. I mean, you might want more, and certainly damages are a factor and potential risk, but so is the risk of getting nothing. So it's probably, I'm not sure it's fair to say just because you have damages of over $5 million you would never accept less than the policy limits if you were concerned about your liability defenses. Your Honor, you're correct, and perhaps I overstated it when I said never have accepted those limits. But in this case, a reasonable person, such as the guardian for Mr. Cahagius, was correct in saying that he would not accept what founders mistakenly thought the limits of the liability policies were. He didn't accept the correct limits either. That's correct. All right. Why don't you come back and rebuttal and follow up. Mr. Kahn. Good morning. May it please the Court. Russell Kahn with my co-counsel, Dawes Cook, representing Founders Insurance Company. I'd just like to say at the beginning it's an honor and a privilege to appear for the first time in the Fourth Circuit Court of Appeals. I'd like to go right to some of the factual confusion, and there is no dispute that the summons and complaint never got beyond Dumez. The Court is correct on looking at this sham affidavit rule, and we submit that Judge Norton, who almost three years ago today listened to us for two hours to debate these issues and had big piles of papers on his bench similar to what you all have up there now. But there is nothing in the record suggesting that that summons and complaint ever got to Hull. And when you look at those emails, there's no reference to a summons and complaint. There's no attachment of a summons and complaint. I depose Clarissa Reed on the 30B6. She's the Hull supervisor and lady, and she was unequivocal. She testified to the IT search they did. We never got these papers. Wade Rankin was deposed by Mr. Kahijus. We represented him at his deposition. He testified to the IT search that Founders did. Founders had no inkling about this lawsuit or this claim until mid-May 2013. So there just isn't any issue of fact. Judge Norton, who took a lot of time, who stated the facts very clearly, he got this right. There's no suggestion, I think, there's no reasonable suggestion in the record that he got it wrong, that somehow that summons and complaint got to Hull. I think the Court's questions about the sham affidavit rule were right on the mark. And Judge Duncan noted it's not just the testimony she gave in deposition that was very clear. The best she could do was say, she said, I've got a foggy memory. I thought I might have given it to him, but I guess I didn't. Dumas was very emphatic. And Dumas, we quoted her deposition in our brief. We asked, are you positive that at no time during this period that Mr. Ruth or Mrs. Ruth ever tell you that they had been served with a lawsuit? I'm positive. I did not hear about that until many months later, as we can see through the documentation here. So there wasn't any doubt in Dumas' mind. She never got these papers. And if she never got the papers, obviously she didn't send them along to Hull, and Hull said that they didn't get it. And you're not contesting the agency relationship with Hull for purposes of this hearing? Correct. Hull is our agency. We might contest it when we go back and try what's left of the bad faith case. But for purposes today, we did not argue that at summary judgment. So you're saying Hull never got the summons and complaints? Correct. And there's not a scintilla of evidence that they did, not even in those e-mails that they referred to or some of the post-claim, you know, straight comments in some of the notes. So we get to the sham affidavit rule, and, again, clearly contradicted by her own deposition testimony, as Judge Duncan pointed out, clearly contradicted by what happened in the underlying action. In the underlying action, founders got the summons and complaint. They hired J.D. Smith in South Carolina. Within five days, he had filed a motion for removal of default within seven days. And no question at all that his job is to try and convince the lower court to remove that default. Founders didn't turn his back. They tried to do it. And he submitted a couple of affidavits. They're in the record. And the record, those affidavits don't make any claim that she gave the summons and complaint to Dumas. And then there's a hearing in the state court on October 30th, 2013, and Judge Nicholson reports this in his decision, which you have in the record. And he says, he gave him another shot. He had his clerk write to J.D. Smith and say, look, we've got your affidavits, but we need another set of affidavits here, and you need to explain to us what you did with the summons and complaint. Get something from founders. Get something from the agent. And there was nothing. I mean, the actions speak louder than any words could. That was the time to come forward with the affidavit she came forward with for Cajigas. And as Judge Norton noted, he properly applied some skepticism to that affidavit, because by then Cajigas, in order to get off the hook of this $5 million judgment, had assigned his rights. And you've got the assignment agreement in the record, and it promises that the Roofs will cooperate with their claim. So as I understand it, Judge Norton's refusal to what he did, we didn't file a motion to strike that. We explained that in our brief below. We thought the proper thing was to ask Judge Norton to disregard that, and he did. And I believe under the Kinzer case, which I should have cited in my brief but didn't, but under the Kinzer case, 613 Federal Appellate 209, Federal APPX 209, that's a 2015 case, that decision is reviewable on an abuse of discretion standard. His findings of fact are reviewable on a clearly erroneous standard, but his decision is reviewable on abuse of discretion. So the summons and complaint really properly never gets a due mess, I think, on any sort of appellate review of the facts. Can I get you to switch a little bit to the issue of the notice that Hull and Founders apparently did receive, that there was at least a notice of representation, and whether that created any responsibility of Founders to take action. And you cited the COSA case. Yes. And I'm familiar with that. That's a waiver case. It's in the same universe, but it's not directly on point, I don't think, with the duty to disclose, or maybe you think it is. Could you comment on whether a waiver case is on all fours with a duty to defend absent notice? You know, I obviously, Your Honor, read COSA a little bit more broadly. It's a Supreme Court 1980 case, still good law. And in that case, the trial court directed a verdict for the insurer where notice of the lawsuit was given to the insurer after a default judgment had entered. The insurer knew about the claim. It even knew about the lawsuit. But did not get notice of the service and complaint from the insurer until it was too late, the default judgment had entered. The insurer walked away. Trial court directed judgment for the insurer, and that was affirmed on appeal. There's a clear contractual breach, and substantial prejudice is clearly shown, I think, is the language. And they do talk about Boyle Bridge, and they have a long sight, and they try to argue in that case, the insurer tried to argue that there was a waiver. And the insurer said no, and the Supreme Court agreed. So, Your Honor, respectfully, I don't look at COSA as a waiver case. I look at it as a case where substantial prejudice clearly appeared because of the default judgment, and the insurer's argument about a waiver proved unavailing because there wasn't a knowing relinquishment of a known right, that standard. You take COSA, and I call it the trilogy. You take COSA, you take Hatchett, and then you take this court's decision in St. Paul, which is Maryland law actual prejudice. But you take those three cases together, which Mr. Cajitius's counsel doesn't even cite, and we say that states the law pretty well, whether you look at this as actual prejudice or substantial prejudice. I can't really tell that there's a significant difference. Texas follows actual prejudice as well, and sometimes uses the word substantial. We haven't found a case nationwide where a default judgment wasn't substantial prejudice. That is really the gold standard of substantial prejudice. If a $5 million default judgment isn't substantial prejudice, Your Honor, I'm not sure what really is. And the fact that there's a notice doesn't undermine that. It doesn't undermine it under COSA. It doesn't undermine it under any law. The obligations under the policy are cumulative. And insurance companies, people get letters all the time. I'm going to sue you or I'm going to make a claim against you. We all know, you know, maybe that's important and that ought to be turned into somebody. But it's the summons and complaint. That's why we're here today. That's what you get. Even your average Joe on the street, I heard a lot of argument this morning about people reading proxy statements that would make your head spin. But even your average Joe on the street knows when the constable shows up at your home, as he did here, and he hands you this scary summons and complaint that talks about the horrible injuries that Mr. Cajigas suffered, and it tells you about you've got 30 days to answer and a default might be given. Even your average Joe and certainly the Ruths, who are not unsophisticated, know that that triggers an independent, separate obligation. We've got to get that off to the insured. It's what they did before on at least two other claims. They knew they needed to do it here, and the evidence is that they didn't. Does that also affect the medical coverage? The MedPay is sort of a quirky little $5,000 argument. We had a brief exchange with Judge Norton on that. In my judgment, Your Honor, and we treat this in our brief with about three pages of argument, we don't think the MedPay is treated the same way as the liability section. Liability, you have these $250,000 limits, one under CGL, one under LICA liability, comprehensive general liability, LICA liability. The MedPay is like first-party insurance. So your two general liability claims, you're into a substantial prejudice calculus. Did the Ruths fail to give proper notice, substantially prejudicing founders? The MedPay is completely different. Mr. Kahidrus, through his counsel, they had the policy. We gave it to them. It says right in the policy you've got to submit the expenses within a year. And then he submits this demand letter, August 27th, and Judge Norton probably found there were no medical bills with that. And there were no medical bills. So founders writes back through J.D. Smith, the defense counsel, says send us the medical bills. They refused. So they never submitted the medical bills within one year. And as I argued to Judge Norton, and I suggest here, it's not that unusual or crazy or unreasonable for our medical insurers to say, hey, look, you want us to pay you a bill, send me the bill, send me the proof of the expense, and we'll write out the check. They actually refused to do that. So we disagree with Mr. Kahidrus' counsel on that issue, that the substantial prejudice analysis applies. It's the same as first-party coverage. I was looking back at the records to refresh my recollection with respect to the guardian, this guardian's statement about accepting money, accepting the liability limits. Page 576, the founders poses the question, had you been offered the 105 that was offered in late October, had you been offered that initially, would you have accepted it to settle Manny's case? The answer, no. Is there an amount that founders could have offered you in response to your initial demand for policy limits that you would have accepted, $5 million? So in short of offering you the $5 million by September 9th at 5 p.m., you would not have settled. Yes. You've read that correctly, Your Honor. We cited that exact exchange in our brief. And this really is more a part of the companion case that used to be a part of this appeal that got dismissed for lack of jurisdiction under this whole Supreme Court case. So we're here only on half of it right now. But again, Judge Norton took extraordinary pains to parse through this narrow window that founders had supposedly. And I would submit the window was illusory. But the letter comes out on August 27th. They have until September 9th to respond. That's about 10 business days. It's this big 11-page letter with all sorts of terms and conditions. No protection for liens. You know, nothing that would determine what type of release would be given. And you have this confusion over whether the coverage is 50, 100 at founders. But Kahijus, through good, experienced counsel, plaintiff's counsel, who says he's advised by a coverage guy, writes back and interprets the demand for J.D. Smith as a demand for $1,005,000. And that's how founders understood it. So this opportunity to settle that they say mitigates prejudice, it really wasn't an opportunity to settle. And I submit Judge Norton got that exactly right. And then Judge Norton, to get to your honest question, goes into the causation issue. And he notes the testimony that you've noted. Mr. Eberly stood up and he read a Q&A from the rehabilitation on that question by Kahijus' counsel to try and suggest an issue of fact. But then founders' counsel, then Mr. Watson, went back and asked Mr. Gianaris a question. And he testified he definitely would not have accepted $105,000 had it been offered and that something more than that would have been required to settle the case. And that's at 585, 586 of the record. So Judge Norton got it right. There was never an opportunity for the meeting of the minds. There was never an opportunity. There was no causation because he never would have accepted it. So mitigating the prejudice through this opportunity to possibly settle the case in this nine-day window just wasn't there. And as your Honor's pointed out in the questioning, founders did come back in late October just before the motion hearing before Judge Nicholson to remove the default and profit the 105. There was no response. It's never been accepted. It was profit again at the district court level. If you noticed in my brief towards the end, it was even profit again in this brief. We're not here about $105,000. If we were here about $105,000, the case would have been over a long time ago. This is an effort to turn a case where Mr. Ruth, and this is in the record very clearly, that he would meet every year with Ms. Dumas. They had a 10-year relationship. She would tell him every year, you need more liability coverage. And he would say, no, I'm on a budget. He knew exactly what he was buying. That was the coverage that was available. There was never really an opportunity to settle at that coverage. And that's why we're here. Just very briefly, I'll go to one issue. And although Judge Norton, after thinking about this for six months, wrote a 38-page decision, there was one part of the case, there was one part of the decision that I would just point out, that on a default versus a default judgment. In Hatchett, you had default, then notice, then default judgment. Summary judgment is a matter of law for the insurer. COSA, you had notice, default judgment. And it was one of the few questions that Judge Norton asked me, but he thought that was significant. I would submit, that might be significant in some circumstances, but here it wasn't significant, and here's why. Because founders got the case on May 15th, and it did everything it could over the next 17 months to get rid of that default. Motion to default, motion hearing, assessment of damages hearing, and they even took an appeal. And when you read Judge Norton's decision, there's an interesting footnote in there suggesting, as I would hear, that the appeal was not by any means a frivolous appeal. It was a very serious question of whether service was properly made on the bar, the LLC, because they served Mrs. Ruth at her home, and the affidavits that were submitted below said she didn't own the bar, didn't run it, wasn't an LLC member. So that was a decent appeal for the bar. The two individuals had a more compelling liability defense. They weren't there that night. You know, they were probably, they were properly served, but they had their own defense. That appeal had some potential. A very interesting position for an insurance company to be in. You're handling an appeal, and then your insurer does an assignment to the plaintiff, and you get an instruction from the insurer to drop the appeal. So what's an insurer to do? We can't instruct our defense counsel to keep appealing. The client has instructed you to withdraw. We had no choice. We dropped the appeal. That was our last chance to try and save this. So we say substantial prejudice is a matter of law. I think it would be a dramatic expansion of the law in South Carolina to say that somehow a notice, the fact that your agent got a notice letter, somehow mitigates the obligation of an insurer to trigger coverage by sending the summons and complaint to the insurer. This is an interesting case in which the insured has no exposure under the insurance policy because the insured sold the claim. That's correct. And is now out from under it. And you have the sort of perverse incentives that you just described. I don't know quite how that's handled. Well, you know, the Skipper case, which we don't need to get into in any length, came out in the South Carolina Supreme Court while we were litigating this, saying that you couldn't assign a legal malpractice claim to a cohesive type plaintiff because it would evoke these shameless shifts in position. And we tried to write that a little bit in the court below with Judge Norton, and he rejected it for summary judgment purposes, but it's a lie. But you don't need to in this case from his point of view because he was ruling there is no coverage. Correct. And the insured is protecting itself, the bar is protecting itself by selling it. And so neither the insurance company nor the bar is implicated in this case. And by selling it, all of a sudden you do have a change of interest. Well, that's exactly right. We went from having a defense counsel with a cooperative insurer trying to help us get rid of a default and defend the case to somebody throwing bombs at us. And the insurer is coming back to bite you. Yeah, exactly right. Thank you. Thank you very much, Your Honor. Mr. Eberle. Thank you. I just have two quick things that I would like to respond to. One is a response to, again, the affidavit that Mrs. Ruth submitted. And the sham affidavit rule does not apply in a case like this. The sham affidavit rule applies when a witness is taking two diametrically opposed positions. That did not occur in this case. The testimony of Ms. Ruth was when asked if she had ---- I'll tell you what the problem is. And you're trying to make it a mechanical thing. The problem is summary judgment based on a deposition. The deposition would have allowed the summary judgment to be entered. Ms. Ruth then gives an affidavit to try to create a question of fact, change of position. Now, whether it's diametrically opposed doesn't matter. If it's effective in trying to create a fact question so as to defeat the summary judgment, it basically undermines, every summary judgment would be undermined. Because anybody who gives a deposition or gives an affidavit in their summary judgment motion and then later comes back and countermands it and says, oh, there's a question of fact, I didn't mean what I said, and the Supreme Court has identified that. And we're not free to overrule the Supreme Court, but we have an opinion on that, too. That's basically you can't create a question of fact. It doesn't have to be diametrically opposed. It has to defeat the summary judgment standard. That would be true, Your Honor, if Mrs. Ruth had simply come back with different testimony. Even if not. If she didn't come back with different testimony, then you didn't gain anything. No, Your Honor. You can't rely on it. Why don't you stick with the deposition where she testified? Mrs. Ruth had the ability to go home, look back at telephone records, e-mails, and refresh her memory. Refreshing memory is not a surprise in the trial court. It is not an inconsistency. What did she do before the deposition? Or the default hearing. Or the default hearing. Or the hearing on the default, which was the basis for the default. Your Honor, I can't tell you what she did to prepare for that. She was, at the time, represented by another attorney. I understand. You're stuck with it. Right. You can't change it thereafter to create a disputed issue of material fact for summary judgment purposes. There are just very few things that are better established. Let me even ask one other question. I mean, assume we were to just ignore all the sham affidavit law. The affidavit says that Ms. Ruth gave the summons and complaint to Nunes, correct? Yes. It doesn't say she gave the summons and complaint to Hull or to Founders, correct? That's right. Thank you.  The only other thing that I would add, Your Honor, is just a quick reference to the medical bills. And we mentioned this briefly in the brief of the party, that there's actually no obligation in the med pay that the actual medical bills be submitted. Instead, all that it calls for is that notice of the expenses be given. And that is certainly done. Thank you. Thank you. We'll come down and greet counsel and then proceed on to the final case.
judges: Paul V. Niemeyer, Allyson K. Duncan, A. Marvin Quattlebaum Jr.